Warren E. Gluck (*pro hac vice*)
HOLLAND & KNIGHT LLP
warren.gluck@hklaw.com
787 Seventh Avenue, 31st Floor
New York, NY 10019
212-513-3396 (telephone)
212-385-9010 (facsimile)

Daniel P. Kappes (SBN 303454)
HOLLAND & KNIGHT LLP
daniel.kappes@hklaw.com
560 Mission Street, Suite 1900
San Francisco, CA 94105
415-743-6951 (telephone)
415-743-6910 (facsimile)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

NIALL LEDWIDGE, MICHAEL PEARSON AND ANDREW CHILDE, AS JOINT OFFICIAL LIQUIDATORS OF SILICON VALLEY BANK (in Official Liquidation), 2nd Floor Harbour Centre, 159 Mary Street, Georgetown, Grand Cayman, Cayman Islands; SILICON VALLEY BANK (In Official Liquidation), 2nd Floor Harbour Centre, 159 Mary Street, Georgetown, Grand Cayman, Cayman Islands,

Plaintiffs,

vs.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity; MARTIN J. GRUENBERG, in his individual capacity,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 5:24-cv-08352

## AMENDED COMPLAINT

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

## COMPLAINT

NOW COME plaintiffs Andrew Childe, Niall Ledwidge, and Michael Pearson, in their capacity as the duly appointed joint official liquidators ("**JOLs**") of Silicon Valley Bank (in Official Liquidation) ("**SVB Cayman Estate**" and collectively with the JOLs, the "**Plaintiffs**") under the supervision of the Grand Court of the Cayman Islands, Financial Services Division ("**Cayman Court**"), Cause No. FSD 163 of 2023 (DDJ) (the "**Cayman Liquidation**") and bring this Complaint against Defendants Federal Deposit Insurance Corporation, in its corporate capacity ("**FDIC-C**") and FDIC Chairman Martin J. Gruenberg, in his individual capacity ("**Gruenberg**" and collectively with FDIC-C, "**Defendants**").

## INTRODUCTION AND NATURE OF THE LITIGATION

1. For the first time in history, the FDIC-C failed to insure foreign depositors in connection with the invocation of the Systemic Risk Exception ("**SRE**"), and instead concentrated losses on them such that they will receive zero, as opposed to the 90% of deposits that would have been paid out to all depositors in a liquidation.

2. Defendants defied the directive of and promise by the Secretary of the Treasury that the FDIC-C would cover and insure all depositors, <u>including foreign depositors</u>, of Silicon Valley Bank, Santa Clara ("**SVB**"), under circumstances where the SRE has *always* been interpreted so. Upon this invocation of the SRE and the Treasury Secretary's pronouncement, all accounts of SVB were insured and FDIC-C was obligated to approve all depositor claims for insurance coverage.

3. The FDIC-C's contention that it was *prohibited* from insuring or paying foreign depositors of SVB is untrue and incompatible with all prior SRE invocations. *Every* prior invocation of the SRE was instituted with the express intent to protect foreign depositors.

4. Secretary Yellen's mandate that all deposits of all depositors of SVB be insured in this case was clear. On March 16, 2023, Secretary Yellen provided Congressional testimony that made clear that her SRE mandate included insurance coverage of foreign depositors (the "**March 16 Yellen Testimony**"):

> Senator LANKFORD: It has been reported publicly that SVB had a large number of Chinese investors that are there, including some that were companies directly connected to the Chinese Communist Party. Will those individuals, companies, entities, and investors that are Chinese investors be made whole based on assessments of my banks in Oklahoma? So, what I am asking is, will my banks in Oklahoma pay a special assessment to be able to make Chinese investors whole from Silicon Valley Bank?

> Secretary YELLEN: <u>Uninsured investors will be made whole in that bank, and I suppose that could include foreign depositors. But I do not believe there is any legal basis to discriminate among the uninsured.</u>

A true and correct copy of excerpts of the March 16 Yellen Testimony is attached hereto as **Exhibit 1**.

5. In arriving at its decision to not to insure the Cayman Depositor Accounts (defined below) and SVB Cayman Operating Accounts (defined below) (collectively, the "**SVB Cayman**

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**Accounts"),** the FDIC-C acted arbitrarily and capriciously, in contravention of applicable precedent and guidance, and in contravention of the express mandate by the Secretary of the Treasury, all of which impermissibly resulted in national-origin predicated disparate impact. To the extent relevant, foreign policy inherently implicates national origin – but not all agencies may *permissibly* engage in that arena.

6.     The JOLs are the duly appointed fiduciaries of the SVB Cayman Estate, appointed by the Cayman Court.  At all times material, including through the present date, the Cayman Court maintained general jurisdiction over SVB, which also consented to and was subject to regulation by the banking regulator, the Cayman Islands Monetary Authority ("**CIMA**").  The Cayman Court placed SVB into Cayman liquidation fully aware of the SVB Receiverships (defined below) in the United States, and consciously made SVB the subject of an ancillary insolvency proceeding in the Cayman Islands under the extreme fact pattern presented.

7.     As officers of the Cayman Court, the JOLs are duly authorized and empowered by the Cayman Court to investigate the affairs of the SVB Cayman Estate and the Cayman Depositors (defined below), administer the distribution of assets, and act as the duly authorized representatives of the SVB Cayman Estate.  In this particular matter, the JOLs are empowered under Cayman Islands law to assert claims not only on behalf of the SVB Cayman Estate, but also as agents of the Cayman Depositors.

8.     In this action, the JOLs seek recovery, redress and re-evaluation of the FDIC-C's incorrect, *ultra-vires* and unconstitutional determinations, a directive that FDIC-C insure and cover the SVB Cayman Accounts, and redress for unjust enrichment.

9.     The JOLs have been authorized to file or have filed three (3) other sets of litigation in the United States arising from the collapse of SVB:

- The JOLs have filed suit against the FDIC in its capacity as receiver for SVB and Silicon Valley Bridge Bank, N.A. (in these capacities, "**FDIC-R**") and the Receivers-in-Charge, pending in the United States District Court for the District of Columbia, Case No. 24-cv-00513-APM ("**Receivership Litigation**").  In the Receivership Litigation, the JOLs have asserted claims relating to FDIC-R's improper disallowance of claims in the SVB Receiverships, Cayman clawback claims relating to the *ultra vires* act of removing Cayman safeguarded accounts from the jurisdiction of the Cayman Islands, and claims under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29

3
AMENDED COMPLAINT

L.Ed.2d 619 (1971) ("**Bivens**") against the Receivers-in-Charge. *See* Receivership Litigation at ECF No. 4;

- The JOLs have initiated an adversary proceeding and submitted a proof of claim in the chapter 11 bankruptcy case of SVB Financial Group, the parent company of SVB ("**SVBFG**"), pending in the United States Bankruptcy Court for the Southern District of New York as Case No. 23-10367 (MG) (the "**SVBFG Litigation**"), asserting tort and negligence claims relating to management of SVB's Cayman operations as well as clawback claims relating to SVBFG's improper receipt of a $294 million dividend in December 2022; and

- The JOLs have also obtained authority to file and will file tort actions against former management of SVB ("**Management Litigation**").

10.   Like this proceeding, in the Receivership Litigation, the SVBFG Litigation and the forthcoming Management Litigation, the JOLs seek redress and recovery on behalf of the SVB Cayman Estate *and* the Cayman Depositors. Attached as **Exhibit 2** are true and correct copies of the Orders of the Cayman Court sanctioning (authorizing) the JOLs to bring the above-referenced litigations, including the present case, on behalf of the SVB Cayman Estate and the Cayman Depositors.

11.   The JOLs sought but did not obtain recognition of the Cayman Liquidation pursuant to 11 U.S.C. §§ 1501 *et seq*. (the "**Chapter 15 Case**").  While Chief Judge Glenn of the United States Bankruptcy Court for the Southern District of New York determined that Chapter 15 recognition could not be granted in this instance because of the technical requirement that the foreign debtor no longer serves as a "bank," he took great care in holding a lengthy evidentiary hearing, in which FDIC-C participated, and wrote a lengthy opinion designed to draw out and rule upon all of the other factors that a court, including this Court, would normally examine in determining whether to extend comity and permit litigation by a foreign court appointee and foreign estate such as the JOLs on behalf of the SVB Cayman Estate.  *See in re Silicon Valley Bank (Cayman Islands Branch)*, 658 B.R. 75 (Bankr. S.D.N.Y. 2024).[1]

---

[1] Pursuant to their statutory duties and as sanctioned by the Cayman Court, the JOLs have filed this litigation, despite not having possession of any books or records concerning the operations of SVB or its Cayman Branch, and despite not being permitted up until this juncture to obtain discovery from the FDIC.  Therefore, this Complaint is filed based solely on the public records currently available to the JOLs.  Regardless, given Secretary Yellen's clear mandate, including in her March 16, 2023 testimony, that all foreign depositors would be insured through the SRE, the JOLs reasonably believe that discovery will yield significant evidence of the intent to cover and insure foreign depositors.

AMENDED COMPLAINT

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

12. Judge Glenn explicitly held that while Chapter 15 recognition was not permitted due to the strict requirements of debtor eligibility, the "JOLs are not without remedy," and that they could appear in each Court where litigation is brought and seek comity, which there was and is no reason to withhold. *Id*. at 90-91. The FDIC-C and FDIC-R appeared in the Chapter 15 action and their expert *agreed* that the Cayman Liquidation was properly commenced as an "ancillary" liquidation of SVB. *See* Chapter 15 Recognition Hearing Transcript at pp. 184, 195, a true and correct copy of which is attached here to as **Exhibit 3**. The JOLs therefore seek comity from this Court.

13. To be clear: the JOLs are the Joint Official Liquidators of SVB, in Official Liquidation, and not merely "liquidators of a branch." In its October 16, 2024 Sanction Order, the Cayman Court amended the caption for the Cayman Liquidation to specifically remove the word "branch" so as to avoid any confusion and in response to arguments made by the FDIC-C and other parties. *See* Exhibit 2.

14. This is a case that shocks the conscience. With the sole exception of SVB insiders, all or virtually all of the depositors that the FDIC-C failed to insure through the SRE are of Chinese national origin or related to entities and operations in Hong Kong and China. This is the first time that FDIC-C chose to ignore the explicit coverage orders of the Treasury Secretary and failed to protect foreign depositors in connection with an SRE invocation. FDIC-C is not entitled deference in connection with its incorrect determinations and often tortured legal interpretations of the FIRREA statute or its mandates. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

15. At root, this case is simple – when the United States Government invoked the SRE and explicitly stated that the FDIC-C would cover "all deposits" of "all depositors," the United States Government meant exactly that. FDIC-C was not at liberty to *selectively* cover accounts for any reason or no reason, and certainly not based upon predicates that are either arbitrary and capricious, incorrect statutory interpretations, or that are unconstitutional in intent or effect.

16. And even if the FDIC-C did maintain discretion to not cover certain accounts notwithstanding the explicit terms of the SRE, it did not have discretion to:

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

     a.   break uniform precedent with prior invocations of the SRE and decline to protect foreign depositors;

     b.   violate its own internal regulations regarding the situs of foreign accounts and account credits (as it did with the SVB Cayman Eurodollar Sweep Accounts (defined below));

     c.   ignore the reality that the SVB Cayman Accounts at issue were jurisdictionally significant CIMA-regulated accounts and benefit from violation of Cayman regulatory safeguards; or

     d.   make decisions which appear on their fact to be based upon national origin considerations without a narrowly tailored and compelling basis to do so (which bases appear to be totally absent here).

17.   Against this backdrop, FDIC-C violated international norms, core principles of legal comity, and banking policy.  The Cayman Court commenced its own insolvency proceedings of SVB in the Cayman Islands not merely based upon SVB's financial collapse, but also upon "just and equitable grounds."  True and correct copies of the Winding Up Order, entered on June 30, 2023, and the Cayman Court's judgment explaining the justifications for the Winding Up Order, entered on July 21, 2023, are attached hereto as **Exhibit 4** (the "**Winding Up Order**") and **Exhibit 5** (the "**July 2023 Opinion**"), respectively.  The rare remedy of a "just and equitable" winding-up (which was done in respect of SVB here) is reserved for the rarest and most shocking cases involving corporate misconduct – *i.e.*, akin to acts that shock the conscience.

18.   Ms. Lee A. Shephard, a renowned United States legal policy journalist, published an article in Tax Notes, one of the nation's impartial, foremost and most formal legal journals, entitled "SOME FOREIGN SILICON VALLEY DEPOSITORS GOT SHAFTED." The article referenced and quoted famously centrist Congressman Cooper's video remarks comparing Defendants' impropriety and erroneous decisions to the mistakes made during Japanese internment following Pearl Harbor.  A true and correct copy of the article is attached as **Exhibit 6**.

19. Recently, the FDIC-C has *admitted* that there has been dysfunction, discrimination – and particularly discrimination against Asian men – endemic to its operations, as revealed in the independent investigation conducted by Cleary Gottlieb Steen & Hamilton LLP for the Special Review Committee of the Board of Directors of the FDIC in April 2024. A true and correct copy of the *Report for the Special Review Committee of the Board of Directors of the Federal Deposit Insurance Corporation* is attached hereto as **Exhibit 7** (the "**Cleary Report**"). *See, e.g.*, Cleary Report at pp. 124, 198, 218 ("The Field Office Supervisor made disparaging race-based comments as well. Several FDIC employees reported that these comments were largely directed toward people of Asian-descent, and, in particular, Asian men.").

20. And Defendants engaged in these acts – *all of them* – not merely from a position of irreconcilable conflict as regulators with a financial interest in the outcome of the FDIC Receiverships of SVB, but through implementation of arbitrary and capricious decisions which appear on their face to have resulted in national origin discrimination.  Of the non-insider depositors of SVB, only Cayman Islands depositors, and at that, only a concentrated set of Cayman Islands depositors of Chinese national origin, have been impacted and treated differently by Defendants.  On its face, the product of the FDIC-C's decisions are incompatible with the United States Constitution, the FDIC statutes, and FDIC regulations that prohibit or require proactive steps to avoid national origin discrimination.

21. On these grounds, Plaintiff assert claims against FDIC-C and Chairman Gruenberg on behalf of the SVB Cayman Estate and the Cayman Depositors.  First, Plaintiffs assert claims under the Declaratory Judgment Act, FIRREA and the Administrative Procedure Act challenging the FDIC-C's arbitrary and capricious decision denying insurance and SRE coverage to the SVB Cayman Accounts.  Second, Plaintiffs assert claims against both FDIC-C and Chairman Gruenberg that the denial of full insurance coverage resulted in national origin discrimination, and that Plaintiffs have been deprived due process and property rights under the U.S. Constitution.  Third, Plaintiffs have asserted claims against FDIC-C for promissory estoppel,

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1   unjust enrichment and deprivation of the liquidation value of Plaintiffs' claims, relating to the

2   FDIC-C's self-interested misrepresentations that all depositors would be covered by the SRE.[2]

3   **JURISDICTION AND VENUE**

4   22.   This action arises under the Fifth Amendment of the United States Constitution, the Federal

5         Deposit Insurance Act, 12 U.S.C. § 1811 *et seq*., as amended ("**Federal Deposit Insurance**

6         **Act**"), the National Bank Act 12 U.S.C. § 21 *et seq.,* as amended ("**National Bank Act**"), and

7         the Administrative Procedure Act, 5 U.S.C. § 500 *et seq,* as amended.  The Court has original

8         jurisdiction over the asserted federal law and constitutional claims pursuant to 28 U.S.C. §§

9         1331, 1334.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over any

10        claim deemed not to contain a federal question because it is part of the same case or controversy.

11  23.   FDIC-C and Gruenberg are subject to suit in this Court. The Federal Deposit Insurance Act

12        contains a general waiver of sovereign immunity and provides that the FDIC-C may "sue and

13        be sued, and complain and defend, by and through its own attorneys, in any court of law or

14        equity, State or Federal." 12 U.S.C. § 1819(a).

15  24.   Venue is proper under 28 U.S.C. § 1391(b) and § 1391(e)(1), as all funds associated with SVB

16        Cayman (defined below) were held via SVB in Cayman jurisdictionally significant accounts

17        and transferred to this District.  Upon the closure of SVB, the FDIC-C took steps to create the

---

[2] The JOLs are aware that many of the issues that would arise from the extraordinary circumstances that give rise to this litigation have already been decided in Plaintiffs' favor in connection with the pending case *SVB Financial Group v. FDIC*, Case No. 23-cv-06543-BLF (N.D. Cal.) ("**SVBFG v. FDIC-C Litigation**").  In that case, this Court has already held:

- There is a factual issue, not appropriate to be determined at the motion to dismiss stage, as to whether the FDIC had any discretion to deviate from Secretary Yellen's mandate that all deposits of all depositors would be protected under the SRE;
- The Court may reasonably infer that when invoking the Systemic Risk Exception, the Treasury Secretary used mandatory language that created a property interest in account funds and that this interest was created by the Treasury Secretary's exercise of authority, rather than any discretion on the part of the FDIC-C;
- FDIC-C's procedure, or lack thereof, for determining claims for SRE coverage under the administrative and procedural framework set forth in 12 U.S.C. § 1821(f) can plausibly be alleged to be a deprivation of due process rights;
- The waiver of the FDIC's sovereign immunity set forth in 12 U.S.C. § 1819 applies to claims for promissory estoppel; and
- The statements and actions of FDIC-C and Chairman Gruenberg, stating that all deposits of all depositors would be and were covered by the SRE, constitutes properly-pled allegations of affirmative misconduct for purposes of a promissory estoppel claim against a federal government agency.

*SVBFG v. FDIC-C Litigation* at ECF Nos. 85 and 162.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Silicon Valley Bridge Bank, N.A. ("**Bridge Bank**") (which resides in this District) and transferred all accounts and funds associated with SVB to the Bridge Bank, including funds associated with SVB Cayman.  Further, whereas Plaintiffs' claims constitute a "claim for insurance" under 12 U.S.C. § 1821(f), venue is also proper under 12 U.S.C. § 1821(f)(4), which provides that a final determination of the FDIC-C regarding a claim for insurance coverage "shall be a final agency action reviewable . . . by the United States district court for the Federal judicial district where the principal place of business of the depository institution is located." Here, the principal place of business for SVB was located in this District.

## DIVISIONAL ASSIGNMENT

25. This action should be assigned to this Court's San Jose Division. Under Rule 3-2 of this Court's Civil Local Rules, "[a] civil action arises in the county where . . . a substantial part of the property that is the subject of the action is situated," and all civil actions that arise in the County of Santa Clara "shall be assigned to the San Jose Division."

26. Both SVB and Bridge Bank are headquartered in the County of Santa Clara, and a substantial part of the property that is the subject of the action – namely the SVB Cayman Accounts which were transferred from jurisdictionally significant Cayman accounts and then digitally sitused at SVB's domestic headquarters – is situated in the County of Santa Clara. This action therefore arises in the County of Santa Clara and "shall be assigned to the San Jose Division."

## NOTICE OF INTENT TO RAISE ISSUES OF FOREIGN LAW

27. Pursuant to Federal Rule of Civil Procedure 44.1 ("**Rule 44.1**"), Plaintiffs hereby give notice of their intent to raise issues of foreign law. Specifically, Plaintiffs contend that the substantive law of the Cayman Islands, as cited herein, governs some or all of the parties' disputes. Pursuant to Rule 44.1, the Mokal Affirmations (defined and attached below) are hereby incorporated by reference.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**I     SVB'S CAYMAN OPERATIONS AND ACCOUNTS**

28.   SVB is an FDIC-insured, state-chartered bank headquartered at all relevant times in Santa Clara, California and established to provide banking services to Silicon Valley's growing number of technology companies.

29.   On August 16, 2007, SVB registered in the Cayman Islands as a foreign company under Part IX of the Cayman Islands Companies Act ("**Companies Act**").  A true and correct copy of relevant excerpts from the Companies Act is attached hereto as **Exhibit 8.**

30.   On August 30, 2007, SVB applied for and was granted a Class "B" banking license from CIMA under the Cayman Islands Banks and Trust Companies Act (2021 Revision) (the "**BTC Act**"). A true and correct copy of relevant excerpts from the BTC Act is attached hereto as **Exhibit 9**.

31.   Following its registration and the granting of a Class "B" license from CIMA, SVB had an active branch in the Cayman Islands: the established SVB Cayman Islands branch ("**SVB Cayman**"), whose primary purpose was to offer deposit products.

32.   As a condition of receiving its Class "B" banking license, SVB agreed that it would be regulated in the Cayman Islands by CIMA and subject to the winding up procedures set forth under applicable Cayman Islands law and the Cayman Court.

   **A.  SVB Cayman Accounts**

         **1.  SVB Cayman's Customer Accounts**

33.   SVB Cayman offered three types of accounts to customers: 1) Eurodollar Sweep Account; 2) Eurodollar Operating Account; and 3) Eurodollar Money Market Account (collectively, the "**SVB Cayman Eurodollar Accounts**" or "**Cayman Depositor Accounts**"). When SVB failed in March 2023, SVB Cayman's customers had, in the aggregate, approximately $866 million deposited in three types of accounts.

               **a.  Eurodollar Sweep Account**

34.   The Eurodollar Sweep Account was a business account offered by SVB Cayman.  In the account agreement, SVB stated that the SVB Eurodollar Sweep Account was "held at Silicon Valley Bank's Cayman Islands Branch."   A true and correct copy of a template account

agreement for a Eurodollar Sweep Account is attached hereto as **Exhibit 10**  (the "**Sweep Agreement**").

35.    The Sweep Agreement states: "The SVB Eurodollar Sweep Account provides clients with a convenient way to earn interest while keeping their funds available for banking needs. Client balances automatically transfer or 'sweep' between the Deposit Account [located in the United States] and the interest-bearing SVB Eurodollar Sweep Account held at Silicon Valley Bank's Cayman Islands Branch."  Sweep Agreement at 1.

36.    The Sweep Agreement contains provisions notifying SVB Cayman customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he SVB Eurodollar Sweep Account shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Sweep Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Sweep Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Sweep Agreement at 3.

37.    At the time of the collapse of SVB in March 2023 ("**SVB Collapse**"), there were forty-four (44) active Eurodollar Sweep Accounts, with total account balances of $389,562,086.

### b.  Eurodollar Money Market Account

38.    The Eurodollar Money Market Account was a traditional, interest-bearing business money market account available to SVB Cayman customers. In the account agreement, SVB affirmatively stated that the Eurodollar Money Market Account was established "at Silicon Valley Bank's Cayman Islands branch office."  A true and correct copy of a template account

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

agreement for a Eurodollar Money Market Account is attached hereto as **Exhibit 11** (the "**Money Market Account Agreement**").

39. The Money Market Account Agreement contains provisions notifying SVB Cayman customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he Eurodollar Money Market Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Money Market Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Money Market Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Money Market Account Agreement at 2-3.

40. At the time of the SVB Collapse, there were one-hundred six (106) active Eurodollar Money Market Accounts, with total account balances of $108,400,111.

### c. Eurodollar Operating Account

41. The Eurodollar Operating Account was a traditional business operating account that was not interest bearing. In the account agreement, SVB affirmatively stated that the SVB Eurodollar Operating Account was established "at Silicon Valley Bank's Cayman Islands branch office." A true and correct copy of a template account agreement for a Eurodollar Operating Account is attached hereto as **Exhibit 12** (the "**Operating Account Agreement**," and together with the Sweep Agreement and the Money Market Account Agreement, the "**SVB Cayman Account Agreements**").

42. The Operating Account Agreement contains provisions notifying SVB Cayman customers-depositors of the applicability of Cayman law, that their accounts are only payable and

collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he Eurodollar Operating Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.

> SVB Eurodollar Operating Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Operating Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Operating Account Agreement at 2-3.

43.    At the time of the SVB Collapse, there were four hundred eighty-four (484) active Eurodollar Operating Accounts, with total account balances of $368,212,751.

### 2.    SVB Cayman's Operating Accounts

44.    Prior to the SVB Collapse, it was the regular practice for SVB Cayman to deposit all of its cash in accounts maintained at SVB's main headquarters. SVB Cayman's sole asset was the depository liability owed by SVB in connection with these accounts (the "**SVB Cayman Operating Accounts**").

45.    SVB Cayman maintained an account at SVB's main headquarters with account number xxxx0000 and the notation "non-interest bearing deposits" and "foreign offices," under circumstances where the sole beneficiary for this account was SVB Cayman (as there were no other foreign deposit taking branches), and the credits located in this account were SVB Cayman's sole asset.

46.    SVB's main headquarters maintained accounts for each and all of the SVB Cayman Eurodollar Accounts with the following account numbers: (i) SVB Cayman Sweep (xxxx5000); (ii) Cayman Eurodollar MMA (xxxx6000); (iii) SVB Cash Sweep Clearing Purchases-Foreign Offices (xxxx1940); (iv) Interest Payable on SVB Cayman Sweep (xxxx0500); and (v) Interest Payable – Cayman Eurodollar MMA Deposits (xxxx0600).

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

47. The SVB Cayman Operating Accounts and their status as a "deposit liability" of SVB, as well as the Cayman Depositor Accounts were jurisdictionally significant, regulated assets that required the SVB Receiverships to obtain Cayman Court recognition to validly control.

**II      THE SYSTEMIC RISK EXCEPTION AND HISTORICAL APPLICATION**

48. Generally, depositors at FDIC-insured depository institutions are insured up to a maximum amount of $250,000. *See* 12 U.S.C. § 1821(a)(1)(E). Congress established the Deposit Insurance Fund ("**DIF**"), which is funded with deposit insurance premium payments collected from banking institutions, and guarantees repayments of insured deposits up to the statutory insured limit of $250,000 upon a bank's failure. *See* 12 U.S.C. § 1821(a)(4).

49. Under the Federal Deposit Insurance Corporation Improvement Act of 1991, the FDIC is generally required to resolve failed banks by using the method that would be least costly to the DIF. Accordingly, for a bank failure in which the SRE has ***not*** been invoked, a lawful approach by the FDIC-C would involve providing insurance to insured deposits through the DIF, and leaving uninsured depositors and creditors to recover under the priority waterfall under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and subsequent amendments thereto ("**FIRREA**").[3]

50. However, Congress provided for a *significant exception* to the least-cost resolution requirement: When the Secretary of the Treasury, acting upon the written recommendation of not less than two-thirds of the members of the Board of Directors of the FDIC and the Board of Governors of the Federal Reserve System and after consulting with the President, determines that utilizing the least-cost resolution method "would have serious adverse effects on economic conditions or financial stability," and action or assistance under section 1823(c)(4)(G) "would avoid or mitigate such adverse effect," the Treasury Secretary may invoke the SRE, and upon such invocation the FDIC-C must insure that which was previously uninsured pursuant to the SRE terms.

---

[3] As a separate matter which is the subject of the Receivership Litigation, FDIC-R has not acted lawfully in determining that the Cayman Depositors and SVB Cayman are not "depositor liabilities" based on nothing but a 1994 Advisory Opinion of FDIC's in-house counsel, and such interpretation is in direct contravention to well-established canons of statutory interpretation.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

51. Any losses to the DIF associated with the invocation of the SRE are required to be recovered through one or more special assessments on insured depository institutions, depository institution holding companies, or both. 12 U.S.C. § 1823(c)(4)(G)(i). To that end, the Board of Directors of the FDIC approved a final rule to implement exactly such a special assessment "to recover the loss to the Deposit Insurance Fund (DIF) associated with protecting uninsured depositors following the closure of Silicon Valley Bank and Signature Bank" on November 16, 2023.

52. Section 1823(c)(4)(G) does not define the specific form in which a decision to invoke the SRE must occur. Rather, the scope of the exception is specifically defined by the Treasury Secretary's determination and invocation, which follows recommendations from the Boards of the Federal Reserve and the FDIC, and consultation with the President of the United States. This is because the SRE is intended to be used only in extraordinary instances where the relevant determination is by the Executive Branch's most senior regulatory officials, rather than the ordinary discretion of administrators at the FDIC. When the SRE has been invoked there has never been a circumstance in which the FDIC-C has failed to insure or has been directed not to insure foreign depositors of the relevant failed bank.

53. Prior to March 2023, the FDIC and Federal Reserve considered five potential emergency circumstances that may have required systemic risk invocation. The Treasury Secretary invoked the SRE with respect to three of those five recommended actions (with two of them targeting specific banks in financial crisis: Wachovia and Citigroup).[4]

54. In each instance where the FDIC and Federal Reserve recommended invocation of the SRE, FDIC and Federal Reserve staff submitted documentation of their analysis to support the SRE recommendation to their respective boards. Each time, the boards of both the FDIC and Federal Reserve voted to recommend a systemic risk determination and submitted written

---

[4] In addition to Wachovia and Citigroup, the Treasury Secretary invoked the SRE to authorize the establishment of the Temporary Liquidity Guarantee Program ("**TLGP**"), a market-wide program to guarantee certain debt issued by banks and to guarantee in full non-interest-bearing deposit accounts held at participating banks and thrifts. The two instances where the Boards of the FDIC and Federal Reserve recommended invocation of the SRE but was not ultimately invoked by the Treasury Secretary involved the potential provision of open bank assistance to Bank of America Corporation and the creation of a Legacy Loans Program under which the FDIC would provide certain guarantees on financing used by public-private investment funds to purchase troubled assets from financial institutions.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

15

AMENDED COMPLAINT

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1  recommendations to the Treasury Secretary. Each time, the FDIC and Federal Reserve issued

2  public statements announcing planned FDIC actions that would require a systemic risk

3  determination for implementation.

4  55.    However, it was the Treasury Secretary, <u>and only the Treasury Secretary</u>, that made the final

5  determination authorizing the FDIC to take planned actions after reviewing the written

6  recommendations submitted by the FDIC and Federal Reserve and consulting with the

7  President.   The Treasury Secretary agreed with the recommendations of the FDIC and the

8  Federal Reserve in three of the five historical instances (TLGP, Wachovia, and Citigroup). In

9  at least two instances where the SRE was invoked, a significant stated reason for invocation of

10  the SRE was <u>protection of uninsured foreign depositors</u>.

11    **A.  Wachovia**

12  56.    In 2008, the SRE was invoked to partially guarantee $312 billion of Wachovia Corporation's

13  ("**Wachovia**") assets in connection with a potential acquisition of Wachovia by Citigroup, Inc.

14  ("**Citigroup**").   When Wachovia was subsequently purchased by a different banking

15  organization, the FDIC assistance that was contemplated pursuant to the SRE was no longer

16  applicable, and the FDIC was limited to its express statutory authority.

17  57.    In a September 29, 2008 staff memo to the FDIC Board of Directors recommending the SRE

18  for Wachovia, it was made clear that SRE coverage of foreign depositors was necessary to

19  avoid systemic risk to the strength of the dollar and maintain confidence in the banking system:

20        In addition, if a least-cost resolution did not support **foreign depositors** (who are
         considered non-deposit, general creditors under the FDI Act); the resolution could
21        imperil this significant source of funding for other U.S. financial institutions. More
         generally, given Wachovia's international presence, global liquidity pressures could
22        increase and confidence in the dollar could decline… Moreover, the individuals and
         businesses whose deposits have been swept into non-deposit investments or foreign
23        deposits (**e.g., at a Cayman branch**) would find all or part of their funds unavailable
         and likely face losses. In the current environment, such an event could shake the
24        public's confidence in bank deposits. All of these effects would likely cause investors
         to sharply raise their assessment of the risks of investing in similar (albeit smaller)
25        regional banks, making it much less likely that those institutions would be able to
         raise capital and other funding.

26

27

28

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Memorandum to the Board of Directors of the FDIC Regarding Wachovia (Sept. 29, 2008) (the "**FDIC Staff Memo Regarding Wachovia**"), at 10-11 (emphasis added). A true and correct copy of the FDIC Staff Memo Regarding Wachovia is attached hereto as **Exhibit 13**.

58.  The April 2010 report of the General Accounting Office ("**GAO**"), a requirement subsequent to any invocation of the SRE, specifically singled out the systemic risk that would be evident by failing to protect Wachovia's foreign depositors:

> **In addition, Treasury, the Federal Reserve, and FDIC expected these [least-cost] resolution options to impose losses on foreign depositors, a significant funding source for several large U.S. institutions.** Their concerns over the possible significant losses to creditors holding Wachovia subordinated debt and senior debt were reinforced by the recent failure of Washington Mutual, a large thrift holding company. According to Treasury's determination, under the least-cost resolution of Washington Mutual, senior and subordinated debtholders of the holding company and its insured depository subsidiaries suffered large losses. **Treasury, FDIC, and the Federal Reserve expressed concern that imposing similarly large losses on Wachovia's creditors and foreign depositors could intensify liquidity pressures on other U.S. banks, which were vulnerable to a loss of confidence by creditors and uninsured depositors (including foreign depositors)**, given the stresses already present in the financial markets at that time.

U.S. Gov't Accountability Off., GAO-10-100, Federal Deposit Insurance Act: Regulators' Use of Systemic Risk Exception Raises Moral Hazard Concerns and Opportunities Exist to Clarify the Provision (April 2008) (the "**April 2010 GAO Report**"), at 13 n. 12 (emphasis added). A true and correct copy of the April 2010 GAO Report is attached hereto as **Exhibit 14**.

**B. Citigroup**

59.  Also in 2008, the SRE was invoked by the Secretary of the Treasury to provide a partial asset guarantee for $306 billion of Citigroup's assets.

60.  Similar to Wachovia, the protection of foreign depositors was a primary reason cited to invoke the SRE by all levels of the Executive Branch. Most notably, the FDIC recommend invocation of the SRE due to Citigroup's vulnerability relating to its dependence on international operations for funding (including $554 billion in foreign deposits). *See* Memorandum to the Board of Directors of the FDIC Regarding Citigroup (Nov. 23, 2008) (the "**FDIC Staff Memo Regarding Citigroup**"), at 5. A true and correct copy of the FDIC Staff Memo Regarding Citigroup is attached hereto as **Exhibit 15**.

61.    The April 2010 GAO Report also pointed to Citigroup's foreign depositors as a justification for invocation of the SRE:

> Treasury, FDIC, and the Federal Reserve were concerned that a failure of Citigroup, which reported that it was well-capitalized (as did Wachovia at the time of the first systemic risk determination), could lead investors to reassess the riskiness of U.S. commercial banks more broadly. In comparison to Wachovia, Citigroup had a much larger international presence, including more than $500 billion of foreign deposits—compared to approximately $30 billion for Wachovia. **Given Citigroup's substantial international presence, imposing losses on uninsured foreign depositors under a least-cost framework could have intensified global liquidity pressures and increased funding pressures on other institutions with significant amounts of foreign deposits**. For example, this could have caused investors to raise sharply their assessment of risks of investing in U.S. banking organizations, making raising capital and other funding more difficult.

April 2010 GAO Report at 25 (emphasis added).

62.    The FDIC-C, as justification for denying the JOLs' claims, erroneously points to 12 U.S.C. § 1831r, titled "Payments on Foreign Deposits Prohibited," as reason for their refusal to provide the Cayman Depositors with full coverage under the SRE.  The FDIC-C purposefully omitted the exception set forth in Section 1831r(b), which permits payments to foreign depositors if a writing by the Board of Directors evidences that such payments are consistent with 12 U.S.C. § 1813(c), which is co-extensive with and includes, *inter alia*, the framework for invocation of the SRE.  As the foregoing makes clear, the invocation of the SRE renders inapposite and inapplicable any alleged prohibition on payment to foreign depositors, particularly where the express justifications for prior invocations of the SRE was protection of foreign depositors.

III    **COLLAPSE OF SVB AND INVOCATION OF THE SRE**

63.    In March 2022, the Federal Reserve Board of Governors ("**Federal Reserve**") raised the federal interest rate by 25 basis points to combat inflation, and from March 2022 to March 2023, increased rates seven more times. SVB's exposure was compounded by the corresponding fall of prices, decimating the value of SVB's bond portfolio. To make matters worse, SVB customers' withdrawal patterns accelerated, and SVB was forced to sell substantially all of its bond portfolio – at a loss of $1.8 billion – to fund withdrawals.

64.    On March 8, 2023, SVB liquidated investments to cover deposits; this included selling off U.S. treasuries and mortgage-backed securities at a $1.8 billion loss.  SVB announced plans to raise

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

capital to address the shortfall, but its customers' confidence was shaken. The ripple effect was immediate, triggering a run on the bank.

65.     On March 9, 2023, SVB customers withdrew more than $40 billion and, at the close of business, SVB had a negative cash balance of $958 million, effectively resulting in the SVB Collapse.

66.     On the morning of March 10, 2023, the California Department of Financial Protection and Innovation ("**DFPI**") determined that (a) SVB's liquidity position was inadequate, and it could not reasonably be expected to pay its obligations as they came due; (b) SVB was insolvent; and (c) SVB was conducting its business in an unsafe manner due to its financial condition.

67.      As a result, DFPI ordered that SVB's property and business be placed into a receivership with FDIC-R (along with the subsequent receivership of the Bridge Bank, the "**SVB Receiverships**").

68.     On March 10, 2023, the day that SVB was closed, the FDIC-C announced that:

> All insured depositors will have full access to their insured deposits no later than Monday morning, March 13, 2023. The FDIC will pay uninsured depositors an advance dividend within the next week. Uninsured depositors will receive a receivership certificate for the remaining amount of their uninsured funds. As the FDIC sells the assets of Silicon Valley Bank, future dividend payments may be made to uninsured depositors.

69.     Over the weekend of March 11, 2023, it was determined that the appointment of FDIC-R as receiver did not calm concerns that there would be further mass withdrawals from deposit accounts.  Further, the initial attempts by FDIC-R and FDIC-C to find a purchaser bank for SVB were unsuccessful.

70.     Over the March 11, 2023 weekend, Treasury Secretary Yellen invoked the systemic risk exception in connection with the SVB Collapse.

71.     On March 12, 2023, a joint statement press release (the "**Joint Statement Press Release**") was issued by Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg, announcing that all SVB assets were transferred to FDIC-R, assuring **all SVB depositors** that they would have full access to their money on Monday morning, March 13, 2023, and that they would be made whole, beyond the

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1    standard insured amount of $250,000.  A true and correct copy of the Joint Statement Press

2    Release is attached hereto as **Exhibit 16**.

3    72.    The FDIC's announcement was based upon Treasury Secretary Yellen's invocation of the SRE

4    for both SVB and Signature Bank, which was based on the unanimous recommendations of the

5    FDIC-C and Federal Reserve and in consultation with the President.  As is clear from the Joint

6    Statement Press Release, the invocation of the SRE for SVB mandated that the FDIC-C insure

7    and pay the **full amount of all deposits for all depositors of SVB**.

8    73.    According to the GAO's statutorily required review of the invocation of the SRE, the FDIC and

9    the Federal Reserve "found that a least-cost resolution of SVB and Signature Bank would

10    intensify deposit runs and liquidity pressures on other U.S. banks," and that "the failure of the

11    two banks would lead to even greater dislocations in deposit markets." U.S. GOV'T

12    ACCOUNTABILITY OFF., GAO-23-10673, BANK REGULATION: PRELIMINARY REVIEW OF

13    AGENCY ACTIONS RELATED TO MARCH 2023 BANK FAILURES (April 2023) (the "**April 2023**

14    **GAO Report**"), at 29.  A true and correct copy of the April 2023 GAO Report is attached

15    hereto as **Exhibit 17**.

16    74.    The FDIC and the Federal Reserve also reported observing broader economic effects of the

17    closures, including the risk that among many uninsured depositors were corporate entities that

18    may not be able to make payroll or pay their suppliers. *Id*. at 30. The Federal Reserve and the

19    FDIC concluded "that preserving unimpaired access to all uninsured deposits for SVB and

20    Signature Bank would help mitigate adverse impacts to financial stability and the economy."

21    *Id*.

22    75.    In fact, the April 2023 GAO Report noted that the Federal Reserve staff specifically analyzed

23    extending only partial protection of uninsured depositors, but the staff concluded that

24    **extending less than 100 percent protection would be insufficient to calm the turmoil at the**

25    **time**, as "extending only partial protection to uninsured depositors would have some beneficial

26    effect, but allowing material losses on these uninsured deposits still would result in significant

27    adverse effects in the financial markets." *Id.* at 30-31.

28

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

76. On March 13, 2023, via a transfer agreement (the "**Transfer Agreement**"), FDIC-R transferred all deposits, both insured and uninsured, and substantially all assets of SVB and SVB Cayman to Bridge Bank, which was newly created pursuant to applicable federal law.  A true and correct copy of the Transfer Agreement is attached hereto as **Exhibit 18**.

77. This was consistent with the press statements made by the FDIC at the time.  On March 13, 2023, the FDIC published its own press release (the "**FDIC Press Release**") stating that the March 12, 2023 transfer of "all deposits — both insured and uninsured — and substantially all assets of" SVB to Bridge Bank was "an action designed to protect **all depositors** of Silicon Valley Bank," and "[d]epositors will have full access to their money beginning this morning, when Silicon Valley Bridge Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities." FDIC Press Release (emphasis supplied). A true and correct copy of the FDIC Press Release is attached hereto as **Exhibit 19**.

78. Moreover, upon the Bridge Bank's opening on March 13, 2023, the FDIC announced on its website that all funds on account with the Bridge Bank were safe and all deposit holders would have full access to their funds:

> IS MY MONEY SAFE? **Yes!** No one lost any money on deposit as a result of the closure of this bank. All deposits, regardless of dollar amount, were transferred to Silicon Valley Bridge Bank, N.A. [*i.e.*, Bridge Bank].

A true and correct copy of a printout from the FDIC's website is attached hereto as **Exhibit 20**.

79. Upon information and belief, the transfer of substantially all assets to the newly created, FDIC-R operated Bridge Bank included the transfer of all funds and credits associated with the SVB Cayman Operating Accounts and the SVB Cayman Eurodollar Accounts.

80. Testimony and statements by Treasury Secretary Yellen and others confirm that all depositors of SVB were fully covered and insured by the invocation of the SRE:

> o <u>March 16 Yellen Testimony</u> – On March 16, 2023, in a statement before the Senate Committee on Finance, Treasury Secretary Yellen stated that "we worked with the Federal Reserve and FDIC to protect **all depositors** of the two failed banks. On Monday morning, customers were able to access all of the money in their deposit accounts so they could make payroll and pay the bills."

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

o **March 22 Yellen Testimony** – On March 22, 2023, in testimony before the Senate Subcommittee on Financial Services and General Government Appropriations, Secretary Yellen stated, "[w]e took actions to protect **all depositors** at the two failed institutions and provide additional liquidity for banks."

o **March 23 Yellen Testimony** – On March 23, 2023, in a statement before the House Subcommittee on Financial Services and General Government Appropriations, Secretary Yellen stated, "[t]wo weeks ago, we learned of problems at two banks that could have had significant impacts on the broader banking system and the American economy. In the days that followed, Treasury worked with the Federal Reserve and the FDIC to take decisive and forceful actions to strengthen public confidence in the U.S. banking system. **We took actions to protect all depositors at the two failed institutions and provide additional liquidity for banks. This was designed to mitigate risks to the banking system**."

o **March 28 Gruenberg Testimony** – On March 28, 2023, in a statement before the Senate Committee on Banking, Housing, and Urban Affairs, FDIC Chairman Martin J. Gruenberg stated, "[a]fter careful analysis and deliberation, the Boards of the FDIC and the Federal Reserve voted unanimously to recommend, and the Treasury Secretary, in consultation with the President determined, that the FDIC could use emergency systemic risk authorities under the Federal Deposit Insurance Act (FDI Act) **to fully protect all depositors in winding down SVB and Signature Bank**."

o **March 28 Barr Testimony** – On March 28, 2023, in a statement before the Senate Committee on Banking, Housing, and Urban Affairs, Federal Reserve Vice Chair for Supervision Michael S. Barr stated that "[t]he Federal Reserve, working with the Treasury Department and the Federal Deposit Insurance Corporation (FDIC), took decisive actions . . . [that] **demonstrate that we are committed to ensuring that all deposits are safe**."

o **March 29 Gruenberg Testimony** – On March 29, 2023, in a statement before the House Committee on Financial Services, FDIC Chairman Gruenberg stated, "[m]y testimony today will describe the events leading up to the failure of SVB and Signature Bank and the facts and circumstances that prompted the decision to utilize the authority in the FDI Act **to protect all depositors in those banks following these failures**."

o **May 11 Hsu Statements** – On May 11, 2023, Acting Comptroller of the Currency and FDIC Director Michael J. Hsu stated at an FDIC board meeting, "[i]n March, the U.S. government invoked the systemic risk exception to the least cost resolution requirement for failing banks. **The purpose was to protect all depositors, including uninsured depositors, following the failures of Silicon Valley Bank (SVB)** and Signature Bank."

o **May 16 Gruenberg Testimony** – On May 16, 2023, in a statement before the House Committee on Financial Services, Gruenberg stated that "[f]ollowing **the decision to fully protect all depositors** in the resolution of both SVB and Signature Bank, there has been a moderation of deposit outflows at the publicly traded banks that were experiencing large outflows in the immediate aftermath of those failures."

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

    o  <u>May 16 Barr Testimony</u> – In a May 16, 2023 statement before the House Committee on Financial Services, Michael S. Barr testified that **cross-border operations** were considered in connection with the systematic importance of banks and invocation of the SRE.

    o  <u>May 18 Gruenberg Testimony</u> – On May 18, 2023, Gruenberg reiterated his position before the Senate Committee on Banking, Housing and Urban Affairs, testifying that "the decision to fully protect all depositors in the resolution of both SVB and Signature Bank."

    o  <u>December 5 Tetrick Statements</u> – On December 5, 2023, during a meeting of the FDIC's Systemic Resolution Advisory Committee, Ryan Tetrick, FDIC Deputy Director for Resolution Readiness, stated that the systemic risk exception "**allowed us to protect all depositors** of the failed banks, transfer those to fully operational bridge banks, and provide some . . . assurance to the system broadly."

    o  <u>December 5 Gruenberg Statements</u> – On December 5, 2023 during the same meeting where Mr. Tetrick made the statement above, Gruenberg acknowledged that in the absence of the SRE, "depositors could get back 90 percent or maybe more of their deposits," but "**the judgment was, at the time, that anything less than 100 percent really had the potential to perpetuate and exacerbate the contagion effect**."

    o  <u>December 5 Mayopoulos Statements</u> – Also during the December 5, 2023 meeting, Bridge Bank CEO Tim Mayopoulos described the SRE as "the government's decision to protect all the deposits at Silicon Valley Bank, **regardless of the nature or size of those deposits**."

    o  <u>The April 2023 GAO Report</u> – The April 2023 GAO Report referenced above reiterated eight times that the systemic risk invocation guaranteed all uninsured deposits of all depositors of SVB.

81.    In summary, on numerous occasions and in numerous venues—including sworn Congressional testimony—the three responsible agencies consistently affirmed that all deposits of all depositors were covered by the SRE, which historically has included coverage of foreign deposit accounts, and that the invocation of the SRE was a clear mandate from senior leaders of the Executive Branch.  The March 16 Yellen Testimony further provides that foreign depositors were intended to be fully protected and insured pursuant to her SRE mandate.

82.    On or about March 27, 2023, the FDIC-C and FDIC-R entered into a Purchase and Assumption Agreement (the "**P&A Agreement**") with First-Citizens Bank & Trust Company ("**First-Citizens**"), covering certain SVB deposits and loans transferred to and then held at the Bridge Bank.  A true and correct copy of the P&A Agreement is attached hereto as **Exhibit 21**.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

83. The P&A Agreement included a purchase of approximately $72 billion of the Bridge Bank's assets at a discount. Notably, the P&A Agreement gave First-Citizens the express option to purchase the Canadian, German, and Hong Kong foreign branches (all of which did not accept deposits and only provided lending services), but did not provide First-Citizens with the option to purchase SVB Cayman (the only foreign branch of SVB that accepted deposits).

84. As a result, SVB Cayman was not purchased by or transferred to First-Citizens pursuant to the P&A Agreement, and First-Citizens did not assume the liabilities owed pursuant to the SVB Cayman Accounts.

85. On June 13, 2023, certain SVB Cayman depositors-creditors submitted a petition to the Cayman Court seeking, *inter alia*, the winding up of SVB under the Companies Act, and the appointment of joint official liquidators for SVB Cayman (the "**Winding Up Petition**").  A true and correct copy of the Winding Up Petition is attached hereto as **Exhibit 22**.

## IV    THE POST-SVB COLLAPSE EXCLUSION OF SVB CAYMAN AND THE CAYMAN DEPOSITORS FROM SRE PROTECTION

86. On or about March 31, 2023, the depositors-creditors of SVB that held Eurodollar Operating Accounts and Eurodollar Money Market Accounts (collectively, the "**Cayman Depositors**") received a notice from FDIC-R stating that, in FDIC-R's view, balances held by customers in accounts originating at SVB Cayman are not deposits, and therefore, their status as a result of SVB's failure is that of general unsecured creditors, which is junior in priority to both insured and uninsured depositors.

87. Also on or about March 31, 2023, the Cayman Depositors received notice from FDIC-R that they were entitled to file claims in the SVB Receivership being administered by FDIC-R as general unsecured creditors, with a claims bar date of July 10, 2023.

88. Account holders for Eurodollar Sweep Accounts did not receive any such notices, with their accounts being granted "insured deposit" status and full protection by the SRE, even though the three SVB Cayman Account Agreements contain identical language that the SVB Cayman Eurodollar Accounts are not FDIC-insured and are payable and collectible only in the Cayman Islands.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

89. FDIC-C has provided holders of the Eurodollar Sweep Accounts with "insured depositor" status, granting them a full guarantee by FDIC-C under the SRE and priority in the SVB Receivership waterfall.

90. Defendants have not published or provided any guidance for this arbitrary and discriminatory treatment among the SVB Cayman account holders.

91. The FDIC's stated justification for this decision is that a certain amount of the funds associated with the Eurodollar Sweep Accounts had "swept back" into an FDIC-insured deposit account located in the United States prior to the commencement of the SVB Receiverships, and thus these account holders are covered by the SRE.

92. FDIC-C's arbitrary decision does not on its face comport with the 12 U.S.C. § 1813(l)(5) definition of an insured deposit, which classifies the Eurodollar Sweep Account as a "foreign account" (*i.e.,* uninsured).

93. Further, the FDIC issued regulations outlining their procedures for making insurance/deposit determinations for complex financial instruments, including uninsured Eurodollar sweep accounts where there is a corresponding insured deposit account in the United States. FDIC regulations state that the insurability of funds associated with sweep accounts maintained by foreign branches is to be determined as of the end-of-business day status of the funds, **not** the location of the funds at the exact time of appointment of the FDIC as receiver:

> 12 CFR 360.8 – Method for determining deposit and other liability account balances at a failed insured depository institution.
>
> (3) In determining Close-of–Business Account Balances involving sweep accounts:
>
> (i) For internal sweep accounts, the FDIC will determine the ownership of the funds and the nature of the receivership claim based on the records established and maintained by the institution for that specific account or investment vehicle as of the closing day end-of-day ledger balance. (For example, if a sweep account entails the daily transfer of funds from a demand deposit account to a Eurodollar account at a foreign branch of the insured depository institution, if the institution should fail on that day, the FDIC would treat the funds swept to the Eurodollar account, as reflected on the institution's end-of-day records, as an unsecured general creditor's claim against the receivership.)[.]
>
> 12 CFR § 360.8(d)(3).

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

94.    In its commentary on the issuance of the final rule for 12 CFR § 360.8, the FDIC used the

example of a Eurodollar sweep account associated with a Cayman Islands branch as an example

of the type of internal sweep account not entitled to insured depositor status:

> *Eurodollar and IBF sweep accounts.* Eurodollar and IBF accounts also are two
> examples of internal sweep investment vehicles. As indicated in the account
> agreement, funds in the deposit account above a specified threshold are swept into
> the Eurodollar or IBF account owned by the same customer. Thus, at the end of the
> business day, the customer's funds in excess of the preestablished threshold are
> reported as residing in a Eurodollar account (typically associated with the
> institution's branch in the Cayman Islands or Bahamas) or an IBF account. At the
> start of the next business day, the depository institution will sweep the balance back
> into the domestic deposit account. The cycle typically repeats itself daily.
>
> In the case of Eurodollar and IBF sweep accounts the FDIC will, for insurance
> purposes, use deposit and account balances as they are reflected as of the institution's
> normal end-of-day. Thus, funds remaining in the domestic deposit account (below
> the preestablished threshold) will be treated as a deposit for insurance purposes.
> Funds that have been swept into the Eurodollar or IBF account, as reflected on the
> institution's end-of-day records, will be treated as unsecured general creditor claims
> against the receivership. Usually the underlying contract for a Eurodollar sweep
> specifies that the obligation at the foreign branch is not payable in the United States
> and, hence, is not a deposit, for deposit insurance and depositor preference purposes.
> Upon an institution's failure, amounts in a Eurodollar account in a foreign branch of
> the failed institution are treated as unsecured, non-deposit liabilities and are not
> eligible for insurance or depositor preference status.

74 Fed. Reg. 20, 5797 (Feb. 2, 2009).

95.    As set forth above, the SVB Cayman Eurodollar Sweep Account agreement provides that end-

of-day, automated transfers from the domestic deposit account to the corresponding SVB

Cayman Eurodollar Account occur on a daily basis for all account funds other than a minimum

balance that remains in the deposit account after business hours. Upon information and belief,

these daily, automated transfers to the Eurodollar Sweep Accounts in fact occurred in practice

prior to commencement of the SVB Receivership.

96.    The decision by the FDIC to make the insurance/deposit determination for Eurodollar Sweep

Account holders as of the moment of SVB's mid-day failure is in **direct contravention** to the

FDIC's established procedures to permit all automated sweep transactions to be completed in

order to arrive at the failed bank's closing end-of-day balance.

97.    The FDIC's commentary on the purpose of its regulated procedures provides:

> The FDIC's intention is to complete internal postings of transactions presented or
> authorized prior to the institution's normal cutoff rules or the FDIC Cutoff Point, as

applicable, according to the depository institution's normal procedures—thus, as explained below, the nature of the liability may change after the FDIC Cutoff Point. <u>Any transaction—including sweep arrangements—would be completed for that day according to normal procedures if it involves only the movement of funds between accounts within the confines of the depository institution.</u> Some sweep arrangements shift funds within the depository institution from a deposit account to ownership in a sweep investment vehicle. The value and nature of these claims will be determined as they rest on the books and records of the depository institution as reflected in its end-of-day ledger balances.

74 Fed. Reg. 20, 5797 (emphasis added).

98.   The decision to include the Eurodollar Sweep Accounts within the insurance of the SRE was, at least in part, a discretionary decision by FDIC-C ***inconsistent with its own regulations*** pertaining to sweep accounts maintained at foreign branches.

99.   FDIC-C's justifications for these actions are questionable where more than 90% by holder (and 99% by value) of the Operating/Money Market Account holders of SVB Cayman are of Chinese origin or China-investment connected, while the demographics of holders of the Eurodollar Sweep Accounts are mixed and nominal – resulting in a stark disparity of outcome as a result of the FDIC-C's decisions.

100.   The discretionary decision to insure the foreign, Eurodollar Sweep Account depositors and not the other depositors of SVB Cayman was arbitrary and capricious or an impermissible exercise of discretion based upon national origin – especially under circumstances where the only possible party impacted was SVB Cayman and its depositors-creditors – given SVB Cayman was the sole foreign deposit-taking branch of SVB.

101.   Alternatively, while in jurisdictionally significant Cayman accounts, significant questions remain regarding the digital situs of the credits being "in" the United States at the time of the transfer, and such credits should have been covered by FDIC insurance and undoubtedly the invocation of the SRE.

102.   In any event, the SVB Cayman Accounts constitute a depository liability owed by SVB and Bridge Bank, the credits are now located in the United States, and fall within the deposit accounts covered by Secretary Yellen's invocation of the SRE.

103.   The arbitrary decision of Defendants is not limited to the classification of the Eurodollar Sweep Accounts as insured deposits. Upon information and belief, with the exception of insider

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

deposit accounts held in the name of SVBFG, all uninsured accounts and other products offered by SVB were granted FDIC insurance in the full amount of the account pursuant to the SRE, or otherwise were liabilities fully assumed by First-Citizens in connection with the P&A Agreement. *See* P&A Agreement, Section 2.1 (listing assumption of liabilities for, *inter alia*, letters of credit, general liabilities, qualified financial contracts, and loan servicing obligations).

104. The egregiousness of FDIC-C's actions is exacerbated by FDIC-C's self-interest as the SVB Receiverships' largest creditor, as well as the recoveries to which Cayman Depositors would have been entitled to in an ordinary bank liquidation.

105. On December 5, 2013, FDIC-C held a public meeting of its Systemic Resolution Advisory Committee ("**December 5 SRE Committee Meeting**"). A true and correct copy of the transcript of the December 5 SRE Committee Meeting is attached hereto as **Exhibit 23**.

106. At the December 5 SRE Committee Meeting, Chairman Gruenberg admitted that, in the event of a traditional bank liquidation and payments to depositors, SVB depositors (which would have properly included the Cayman Depositors) would have received at least 90% of their deposit amounts:

> And I take the point, and we obviously gave serious consideration to it. And it's true with an advance dividend, depositors could get back 90 percent or maybe more of their deposits. I think the judgment was at the time that anything less than 100 percent really had the potential to perpetuate and exacerbate the contagion effect. And we had pretty clear evidence of that.

Ex. 22 at pp. 44-45.

107. The FDIC-C has already stipulated to a 90% liquidation value for claims made against the FDIC-C by SVB depositors. On March 11, 2025, FDIC-C, FDIC-R and SVB Financial Trust ("**SVBFT**") submitted a stipulation to this Court that, to the extent 12 U.S.C. § 1821(i)(2) applies (the FIRREA provision capping the FDIC's liability to the liquidation value of a depositor's claim in certain circumstances), SVBFT's $1.9 billion claim is capped at $1.7 billion (implying a 90% liquidation value). *See SVBFT v. FDIC-C*, Case No. 5:23-cv-06543-BLF (N.D. Cal.) at ECF No. 174.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

108.  The financials statements for the SVB Receiverships for the year ending December 31, 2024 (the "**FDIC-R Financials**") further evidence the self-interested motivations of FDIC-C and the unjust enrichment it has received.  A true and correct copy of the FDIC-R Financials for the SVB Receiverships is attached hereto as **Exhibit 24**.

109.  The FDIC-R Financials indicate that FDIC-C has asserted subrogated claims against the receivership estates – due to FDIC-C's coverage of SVB depositors and which will be paid *pari passu* with depositor claims under the FIRREA receivership waterfall provision – in the amount of **$21.7 billion** (the "**Subrogated Claims**").  Meanwhile, FDIC-C has already received payment as of December 2024 from the SVB Receiverships of **$159 million** on account of its subrogated claims against the SVB Receiverships.

110.  As the largest asserted creditor of the SVB Receiverships, FDIC-C and its employees managing the SVB Receiverships are motivated to contest any claims – including those of the SVB Cayman Estate and the Cayman Depositors – which would limit FDIC-C's recovery on its Subrogated Claims.

111.  The Treasury Secretary did not and could not leave it to the discretion of administrators at the FDIC to pick which depositors to pay, in what amounts, and at what time. The Joint Statement Press Release, publicly announcing the Treasury Secretary's determination and invocation of the SRE, was made with the explicit purpose of communicating to depositors the parameters within which the federal government was willing to act to protect the financial markets from crashing. The message was clear:  all depositors would receive insurance coverage under the SRE.  Secretary Yellen's March 16, 2023 testimony expressly states that SRE coverage would extend to foreign depositors.

112.  Even if the FDIC-C had the right to alter the scope of the Treasury Secretary's invocation of the SRE, the FDIC-C did not promulgate any regulations, notice or guidance prescribing procedures for resolving claims held by SVB Cayman and the Cayman Depositors.

113.  Accordingly, the FDIC-C's denial of the JOLs' claim for insurance and SRE coverage is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

114. The FDIC-C's current position that it possesses unfettered discretion to decide which depositors to protect and insure and in what amounts, is simply incorrect. It is clear from the record and historical practice that uninsured and insured depositors, foreign and domestic, were fully protected by the Treasury Secretary's invocation of the SRE and that FDIC-C was required to provide full insurance coverage.

## V    EFFECT OF THE WINDING UP ORDER AND THE JOLS' STANDING TO ASSERT THE CLAIMS AGAINST THE FDIC-C

115. Upon the making of a winding up order in relation to a company in the Cayman Islands, a statutory trust comes into effect. It is well accepted that the assets of the company are impressed with a statutory trust in the sense that they constitute a fund to be administered by the liquidator as officer of the court and agent for all persons interested in the winding up.

116. The winding up of a foreign company delimits the ambit of the trust and the powers of the liquidators, but it does so in aid of collectivity as well, and in particular, with a view to ensuring that creditors subject to the Cayman Court's jurisdiction are not treated disadvantageously in the foreign insolvency proceeding. If and once satisfied to this effect, the Cayman court may permit even the assets located outside of the Cayman Islands to be transferred to and be distributed in the foreign proceeding.

117. Attached as **Exhibit 25** is the April 3, 2025 Affirmation of Dr. Riz Mokal, the JOLs' Cayman Law Expert, which attaches and incorporates the various affirmations which Dr. Mokal has submitted in the Chapter 15 Case as well as the SVBFG Litigation (collectively, the "**Mokal Reports**"). Attached as **Exhibit 26** is the transcript of the March 5, 2025 deposition of Dr. Mokal in the SVBFG Litigation (collectively with the Mokal Reports, the "**Mokal Affirmations**"). The Mokal Affirmations, set forth, *inter alia*, the bases under Cayman Law why the ancillary liquidation of SVB ordered by the Cayman Court was proper and did not restrict the JOLs from acting solely within the Cayman Islands, particularly given the extraordinary circumstances of this case. The Mokal Affirmations further apply English/Cayman law agency principles to the circumstances of this case in opining that the

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

JOLs are acting as agent of the Cayman Depositors in connection with this case and the other litigations filed by the JOLs within the United States.

118.  On June 13, 2023, certain SVB Cayman depositors-creditors which had been classified as uninsured, general creditors of the SVB Receiverships, submitted a Winding Up Petition to the Cayman Court seeking, *inter alia*, the winding up of SVB under the Companies Act, and the appointment of joint official liquidators.

119.  On June 30, 2023, the Cayman Court issued the Winding Up Order, which authorizes Plaintiffs Michael Pearson, Andrew Childe, and Niall Ledwidge to act jointly and severally as joint official liquidators for SVB.

120.  The Cayman Proceeding is an ancillary winding up of a U.S. Bank in the Cayman Islands, whereby the Cayman Court ordered the winding up of SVB itself and provided that the JOLs' "powers shall be limited to acting in respect of the assets and affairs of the Cayman Islands branch of [SVB] and its creditors." Winding Up Order at 1-2.

121.  In implementing the Cayman Proceeding, Justice Doyle carefully noted the statutory basis for the Cayman Proceeding, the reasons that the commencement was within his authority, and the unique circumstances of the Cayman Depositors within the resolution of the bank by the FDIC that necessitated a "just and equitable" winding up under the supervision of the Cayman Court. July 2023 Opinion ¶ 63.

122.  Justice Doyle found, as a fact, that SVB "is and remains registered under Part IX," and the Cayman Court therefore had jurisdiction to wind it up. July 2023 Opinion ¶¶ 51, 54. Justice Doyle further found that SVB has and has had "a clear and sufficient connection with the Cayman Islands," including that it received funds within the jurisdiction and "is regulated by" CIMA. *Id.* ¶¶ 51, 56.

123.  Fully satisfied that the "core requirements" for exercising jurisdiction had been met and the fact that the Debtor was unable to pay its debts, Justice Doyle concluded it was appropriate for the Cayman Court to exercise its discretion in favor of making the Winding Up Order. *Id.* ¶¶ 59, 61- 63. Yet, Justice Doyle went further: "I should add not only am I satisfied on the inability to pay debts ground but I would also be satisfied on a just and equitable basis." *Id.* ¶ 63. Justice

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Doyle recognized there was "a reasonably probability of a benefit of those applying for a winding up order if the winding up order is made," noting "that the liquidators can investigate the matter and can take action to establish the status of the Cayman Depositors." *Id.* ¶ 57.

124. The rare remedy of a "just and equitable" winding-up is reserved for cases concerning corporate misconduct that shock the conscience.

125. In granting the Winding Up Petition and appointing the JOLs to act on behalf of SVB, Justice Doyle confirmed that doing so was "just and equitable" and necessary to protect the interests of Cayman depositor-creditors who would otherwise be left with no remedy:

> I am satisfied that I should exercise my discretion in making a winding up order. I should add not only am I satisfied on the inability to pay debts grounds but I would be satisfied on a just and equitable basis. **There appears to be a battle looming in respect of the treatment of the American and Cayman depositors. An investigation needs to be taken place in respect of the apparent removal of any moneys and assets from the Branch out of this jurisdiction. The position of the Cayman depositors needs to be investigated further and where appropriate safeguarded**.

*Id.* ¶ 63 (emphasis added).

126. As fiduciaries and officers of the Cayman Court, the JOLs are duly authorized and empowered by the Cayman Court to investigate the affairs of SVB Cayman, to administer the distribution of its assets, and to act as the duly authorized representatives of SVB.

127. Under the present circumstances, the JOLs are empowered under Cayman Islands law to assert claims not only on behalf of SVB Cayman, but have also been empowered as agent to assert claims on behalf of the Cayman Depositors.

128. Pursuant to Cayman law and the Winding Up Order, the liquidator is first and foremost the agent of the company to which they have been appointed. At the same time, the liquidator is a trustee of the well-recognized statutory trust whose beneficiaries are the creditors.

129. In addition to the authorization and mandate contemplated in the Winding Up Order, the JOLs' authority to act on behalf of the creditors of SVB in the Cayman Islands also arose by implicit agreement and ratification, *as well as* explicit agreement.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

130.    As set forth in the Mokal Affirmations, the Cayman Depositors understand this to be the case are supportive of the grant of authority, and have further explicitly granted this authority as principal, to the JOLs as agents through opt-out notices delivered to the Cayman Depositors.

131.    No party objected to entry of the Winding Up Order, no party sought to appeal the Winding Up Order and no party (other than the FDIC and SVBFG) has objected to the steps taken by the JOLs to date in various litigations across the United States.

132.    The Cayman Depositors not only know that pursuant to the Winding Up Order and subsequent actions, the JOLs have been granted the role as their agent, but supported this as the best possible avenue for economical and equitable recovery, and otherwise support and agree to contractual recovery.

## VI    FDIC-C's FINAL DENIAL OF INSURANCE AND SRE COVERAGE

133.    Despite its arbitrary and capricious decision not to provide insurance and SRE coverage to SVB Cayman or the Cayman Depositors, FDIC-C has not promulgated any regulations for submission of a claim for coverage under Secretary Yellen's invocation of the SRE or a claim for insurance under § 1821(f).

134.    On April 17, 2024, the JOLs sent a letter to the FDIC-C, setting forth the basis for the Plaintiffs' claims, the policy arguments for why the FDIC-C's arbitrary actions were contrary to sound banking policy, and offering to engage in constructive alternative dispute resolution (the "**SRE Claim Letter**").  A true and correct copy of the SRE Claim Letter is attached hereto as **Exhibit 27**.

135.    On September 25, 2024, FDIC-C sent a letter denying the JOLs' claim, providing the JOLs sixty (60) days from the date of the letter to seek judicial intervention on the FDIC-C's final agency determination (the "**Claim Denial Letter**").  A true and correct copy of the Claim Denial Letter is attached hereto as **Exhibit 28**.

136.    On November 21, 2024, the Cayman Court entered an Order authorizing the JOLs to file this action on behalf of the SVB Cayman Estate and the Cayman Depositors.  *See* Exhibit 2.

### CLAIMS FOR RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

## COUNT I: REVIEW OF FINAL AGENCY ACTION UNDER 12 U.S.C. § 1821(F) (AGAINST FDIC-C)

137.  Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

138.  Pursuant to the Winding Up Order, subsequent orders of the Cayman Court and agency principles, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman Estate and as exclusive agent of the Cayman Depositors.

139.  Pursuant to 12 U.S.C. § 1821(f)(4), "[a] final determination by the Corporation regarding any claim for insurance coverage shall be a final agency action reviewable in accordance with" the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Under the Administrative Procedure Act, the reviewing court must set aside FDIC-C's determination if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law as set forth in 5 U.S.C. § 706.

140.  Plaintiffs assert that the Treasury Secretary's invocation of the SRE and mandate that all depositors would be protected by the SRE – including foreign depositors – transformed all SVB accounts into fully insured accounts in their total amount.  Accordingly, under this Count, Plaintiffs seek redress for the SVB Cayman Accounts as a claim for insurance pursuant to 12 U.S.C. § 1821(f) (and its incorporation of the Administrative Procedure Act).

141.  FDIC-C's denial of Plaintiffs' claims for insurance coverage was arbitrary and capricious and resulted in an unconstitutional act on the basis of national origin, lacked due process and fair notice, was inconsistent with FDIC-C's treatment of Eurodollar Sweep Account holders in contravention to its own regulations, and was in contravention to the Treasury Secretary's SRE mandate.

142.  FDIC-C has not established sufficient rules or procedures governing the submission or adjudication of insurance claims for SVB or Bridge Bank depositors, including guidelines governing the resolution of a depositor's claim.

143.  FDIC-C continues to withhold payment and insurance coverage from Plaintiffs and the Cayman Depositors, contravening federal law, the Treasury Secretary's statutory mandate, its own recommendations and numerous public announcements by senior government officials,

34

including Chairman Gruenberg and Secretary Yellen, that the Treasury Secretary's determination and invocation of the SRE protected all deposits of all depositors of SVB. Accordingly, the determinations in FDIC-C's Claim Denial Letter must be set aside as arbitrary, capricious, and an unconstitutional abuse of discretion.

144.  WHEREFORE, Plaintiffs request, pursuant to 12 U.S.C. § 1821 and 5 U.S.C. § 706, that this Court hold unlawful and set aside FDIC-C's denial of Plaintiffs' request for full SRE insurance coverage,  as well as requiring that FDIC-C provide full SRE insurance coverage to Plaintiffs in the total amount of the SVB Cayman Accounts, without affording deference to FDIC-C's arbitrary and capricious decision.[5]

### COUNT II: REVIEW OF FINAL AGENCY ACTION UNDER 5 U.S.C. §§ 701-706 (AGAINST FDIC-C)

145.  Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

146.  Pursuant to the Winding Up Order, subsequent orders of the Cayman Court and agency principles, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman Estate and as exclusive agent of the Cayman Depositors.

147.  Pursuant to the Administrative Procedure Act, a final agency action for which there is no other adequate remedy in a court is subject to judicial review.  5 U.S.C. § 704.

148.  Section 706 of the Administrative Procedure Act provides the following concerning this Court's scope of review:

---

[5] As the Supreme Court has explained, the United States has not waived its sovereign immunity when it comes to APA claims seeking money damages. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999). A party seeks "money damages" if he or she is seeking "substitute" relief, rather than "specific" relief. *Id.* at 262, 119 S.Ct. 687. In other words, "[money] [d]amages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.' " *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 895, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)). Whether the relief sought is "substitute" or "specific" is the touchstone of this inquiry. Therefore, the fact that "a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages,'" *Bowen*, 487 U.S. at 893, 108 S.Ct. 2722, if that sum of money constitutes "the very thing" to which the plaintiff claims he is entitled. For example, in *Bowen*, Massachusetts claimed that it was statutorily entitled to about $6.5 million in Medicaid reimbursement which the Secretary of Health and Human Services had denied. Though a successful suit would obviously result in an award of money, the Supreme Court found that Massachusetts's claim was for "specific relief ([which] undo the Secretary's refusal to reimburse the State) rather than for money damages" because it did not seek "relief that substitutes for that which ought to have been done...." *Id.* at 910, 108 S.Ct. 2722.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

    (1) compel agency action unlawfully withheld or unreasonably delayed; and

    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

149.  Plaintiffs assert that, to the extent this Court determines that Plaintiffs' claim for full payment and coverage under the Treasury Secretary's invocation of the SRE is not a "claim for insurance" under 12 U.S.C. § 1821(f), the Claim Denial Letter issued by FDIC-C constitutes a final agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

150.  FDIC-C's denial of Plaintiffs' claims for SRE payment and coverage was arbitrary and capricious, resulted in unconstitutional treatment on the basis of national origin, and was in excess of FDIC-C's statutory authority.  The Claim Denial Letter is contrary to the terms of the SRE determination by the Secretary of the Treasury, which FDIC-C has no discretion or authority to alter or ignore and is inconsistent with FDIC's treatment of Eurodollar Sweep Account holders in contravention to its own regulations.

151.  FDIC-C has not established sufficient rules or procedures governing the submission or adjudication of insured and uninsured deposit claims for SVB or Bridge Bank depositors, including  guidelines governing the resolution of a depositor's claim.

152.  FDIC-C continues to withhold payment and SRE coverage from Plaintiffs and the Cayman Depositors, contravening federal law, the Treasury Secretary's statutory authority, its own recommendations and numerous public announcements by senior government officials, including Chairman Gruenberg, that the Treasury Secretary's determination and invocation of the SRE protected all deposits of all depositors of SVB. Accordingly, the determinations in

1    FDIC-C's Claim Denial Letter must be set aside as arbitrary, capricious, unconstitutional and

2    an abuse of discretion.

3    153.    WHEREFORE, Plaintiffs request, pursuant to 5 U.S.C. § 706, that this Court hold unlawful and

4    set aside FDIC-C's denial of Plaintiffs' request for full SRE insurance coverage,  as well as

5    requiring that FDIC-C provide full SRE insurance coverage to Plaintiffs in the total amount of

6    the SVB Cayman Accounts, without affording deference to FDIC-C's arbitrary and capricious

7    decision.[6]

8    ## COUNT III – CLAIM UNDER THE NATIONAL BANK ACT AND 12 U.S.C. § 1821(I) FOR
     RECOVERY OF LIQUIDATION VALUE
9    (AGAINST FDIC-C)

10   154.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

11   155.    Pursuant to the Winding Up Order, subsequent orders of the Cayman Court and agency

12   principles, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman

13   Estate and as exclusive agent of the Cayman Depositors.

14   156.    On or about March 27, 2023, the FDIC-C and FDIC-R entered into the P&A Agreement with

15   First-Citizens, covering SVB deposits and loans transferred to and then held at the Bridge Bank.

16   *See* Exhibit 20.

17   157.    The P&A Agreement included a purchase of approximately $72 billion of the Bridge Bank's

18   assets at a discount. Notably, the P&A Agreement gave First-Citizens the express option to

19   purchase the Canadian, German, and Hong Kong foreign branches (all of which did not accept

---

[6] As the Supreme Court has explained, the United States has not waived its sovereign immunity when it comes to APA claims seeking money damages. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999). A party seeks "money damages" if he or she is seeking "substitute" relief, rather than "specific" relief. *Id.* at 262, 119 S.Ct. 687. In other words, "[money] [d]amages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.' " *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 895, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)). Whether the relief sought is "substitute" or "specific" is the touchstone of this inquiry. Therefore, the fact that "a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages,'" *Bowen*, 487 U.S. at 893, 108 S.Ct. 2722, if that sum of money constitutes "the very thing" to which the plaintiff claims he is entitled. For example, in *Bowen*, Massachusetts claimed that it was statutorily entitled to about $6.5 million in Medicaid reimbursement which the Secretary of Health and Human Services had denied. Though a successful suit would obviously result in an award of money, the Supreme Court found that Massachusetts's claim was for "specific relief ([which] undo the Secretary's refusal to reimburse the State) rather than for money damages" because it did not seek "relief that substitutes for that which ought to have been done.... " *Id.* at 910, 108 S.Ct. 2722.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

deposits and only provided lending services), but did not provide First-Citizens with the option to purchase SVB Cayman (the only foreign branch of SVB that accepted deposits).

158. As a result, SVB Cayman was not purchased by or transferred to First-Citizens pursuant to the P&A Agreement.  Further, the SVB Cayman Accounts have received $0 recovery from the SVB Receiverships or the FDIC-C through the SRE, let alone the "90% or more" liquidation value which Chairman Gruenberg asserts would have been available upon an ordinary bank liquidation.

159. As a result of the P&A Agreement and the other activities of FDIC-C as set forth above, the estates of the SVB Receiverships have been rendered insolvent with no ability to pay the 90% liquidation value to which Plaintiffs are entitled.  *See* FDIC-R Financials at Ex. 24.

160. The National Bank Act prohibits transfers by a bank when the bank is insolvent or in contemplation of insolvency that are taken with a view to the preference of one creditor over another. 12 U.S.C. § 91.

161. Upon the appointment of a receiver for a federally-chartered bank, including FDIC-R, the National Bank Act requires such receiver to ratably distribute the assets of a failed, nationally-chartered bank. 12 U.S.C. § 194.  The FDIC-C also has an obligation to ensure a ratable distribution is made to depositors.  *See Branch v. FDIC*, 825 F.Supp. 384, 413-415 (D. Mass. 1993) (permitting private right of action under the National Bank Act against FDIC-C in connection with failure to provide ratable distribution to depositors)

162. Accordingly, Sections 91 and 194 of the National Bank Act imposes the obligation to provide a pro rata distribution to the Plaintiffs, both on behalf of the SVB Cayman Estate and as the exclusive agent of SVB Cayman's creditors-depositors, up to the 90% liquidation value of their claims. *See* 12 U.S.C. § 1821(i)(2).

163. WHEREFORE, Plaintiffs are entitled to judgment against FDIC-C awarding it the amount of the distribution to which they are entitled under 12 U.S.C. §§ 91, 194 and 1821(i)(2), plus all applicable pre-judgment and post-judgment interest.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**COUNT IV: VIOLATION OF DUE PROCESS RIGHTS UNDER THE FIFTH
AMENDMENT OF THE U.S. CONSTITUTION
(AGAINST FDIC-C)**

164. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

165. Pursuant to the Winding Up Order, subsequent orders of the Cayman Court and agency principles, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman Estate and as exclusive agent of the Cayman Depositors.

166. The Fifth Amendment's Due Process Clause protects against the government's deprivation of property without adequate due process. Further, the Fifth Amendment requires the federal government and government officials to govern impartially and not draw distinctions between individuals based on national origin.

167. The FDIC-C refuses to provide Plaintiffs with complete access to funds or credits associated with the SVB Cayman Accounts, and refuses to provide SRE and insurance coverage, on the basis that the "Treasury Secretary's invocation of the systemic risk exception under 12 U.S.C. §1823(c)(4)(G) imposed no enforceable payment obligation on FDIC-C."  Claim Denial Letter at 1.

168. However, the Treasury Secretary's invocation of the SRE to guarantee *all* deposits of *all* depositors of SVB, including *foreign* depositors, as set forth in the March 12, 2023 Joint Statement Press Release, the March 16 Yellen Testimony, and the other public statements by government officials, created a property interest protected by due process.

169. The FDIC and the Treasury Secretary have repeatedly stated that the purpose and effect of the SRE was to guarantee all deposits of all SVB depositors. The history of the analysis and deliberations leading to the recommendations of the FDIC and Federal Reserve and official invocation by the Treasury Secretary is that consideration of a less than complete guarantee for all depositors was considered and rejected.  This would be consistent with historical practice, where previous invocations of the SRE included considerations for foreign depositors.

170. Plaintiffs, on behalf of the SVB Cayman Estate and as exclusive agent to the Cayman Depositors, have a claim of entitlement to all funds associated with the SVB Cayman Accounts

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1  because the Treasury Secretary's SRE invocation guaranteed all depositors, including foreign

2  depositors would be paid by the DIF.  Accordingly, the invocation of the SRE created a property

3  interest that FDIC-C cannot unilaterally deprive Plaintiffs without adequate due process and

4  just compensation.

5  171.  It appears that FDIC-C's substantive rationale for treating SVB Cayman and the Cayman

6  Depositors differently than other depositors (including holders of the SVB Cayman Eurodollar

7  Sweep Accounts) is the text of 12 U.S.C. § 1831r, a statutory provision that contains an express

8  exception for invocation of the SRE which has historically been implemented for the purpose

9  of protecting foreign depositors.

10  172.  FDIC-C also has not provided SVB Cayman and the Cayman Depositors sufficient procedural

11  due process with respect to its refusal to provide insurance coverage under the SRE, as FDIC-

12  C has not issued regulations or directives notifying SVB Cayman and the Cayman Depositors

13  that they would be required to do anything to be granted SRE coverage which was publicly

14  promised to all SVB depositors.

15  173.  WHEREFORE, Plaintiffs respectfully request that the Court find that FDIC-C's refusal to

16  provide Plaintiffs with full SRE and insurance coverage for the SVB Cayman Accounts is

17  unlawful because it violates the Fifth Amendment Due Process rights of SVB Cayman and the

18  Cayman Depositors, and issue injunctive relief mandating FDIC-C provide full insurance and

19  SRE coverage.

### COUNT V: PROMISSORY ESTOPPEL
### (AGAINST FDIC-C)

174.  Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

175.  Pursuant to the Winding Up Order, subsequent orders of the Cayman Court and agency

principles, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman

Estate and as exclusive agent of the Cayman Depositors.

176.  On March 12, 2023, the Treasury Secretary invoked the SRE to directly address the imminent

risk of a continued run on the international banking system by borrowers withdrawing

significant amounts of uninsured deposits. The Treasury Secretary's invocation and

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

determination of a systemic risk exception was announced in the Joint Statement Press Release with the FDIC and the Federal Reserve, which stated that the Treasury Secretary's invocation of the SRE guaranteed that all deposits of all depositors of SVB would be fully protected and that all funds associated with these accounts would be safe. The March 16 Yellen Testimony confirmed that this included full SRE insurance of foreign depositors.

177. The FDIC-C made its own statements following the Joint Statement Press Release, announcing that all SVB deposits had been transferred to Bridge Bank and that all depositors would have full and immediate access to their accounts in their accounts the following day.

178. The express purpose of FDIC-C's promise, as set forth in subsequent Congressional testimony, was to prevent a bank run that would affect public confidence in and the soundness of the banking system, *taking into consideration the cross-border nature of SVB*.

179. The public statements assuring all SVB depositors that their funds were safe and all depositors would be fully protected by the SRE were designed to induce reliance by SVB depositors, including SVB Cayman and the Cayman Depositors, to keep their funds at Bridge Bank and stem contagion effects to the wider global banking sector. FDIC-C not only intended that its public statements be relied upon, but reasonably should have expected SVB Cayman and the Cayman Depositors to rely on its guarantee to protect and insure all depositors.

180. Upon information and belief, in reliance on the announced guarantee of full SRE coverage for all SVB deposits, SVB Cayman and the Cayman Depositors did not attempt to withdraw or transfer all of its deposits out of SVB or Bridge Bank, and did not further alert Cayman authorities to the prejudice that would only be uncovered once the FDIC revealed that holders of the SVB Cayman Accounts would be entitled to $0 recovery from the SVB Receiverships or the FDIC-C.

181. In the months following the Treasury Secretary's invocation of the SRE on the FDIC-C's recommendation, FDIC-C representatives repeatedly confirmed that all deposits and all depositors were protected under the SRE.

182. If the FDIC-C's position is that it has complete discretion to determine whether or not to provide SRE coverage to SVB depositors, its statements on March 12-13, 2023 press releases and

41

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

subsequent testimony of FDIC-C officials, including Gruenberg, were knowingly false and amounted to affirmative misconduct by the FDIC-C.

183. The injustice suffered by SVB Cayman and the Cayman Depositors can only be avoided by enforcement of FDIC-C's promise, namely, that all deposits of all depositors will be covered and insured by the SRE.

184. SVB Cayman and the Cayman Depositors have suffered damages from its reasonable reliance on FDIC-C's public announcement that the Treasury Secretary's SRE invocation protected all deposits of all SVB depositors.

185. WHEREFORE, Plaintiffs on behalf of SVB Cayman and the Cayman Depositors seek compensatory damages to be proven at trial, plus interest, costs, fees and punitive damages.

## COUNT VI – UNJUST ENRICHMENT
## (AGAINST FDIC-C)

186. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

187. Pursuant to the Winding Up Order, subsequent orders of the Cayman Court and agency principles, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman Estate and as exclusive agent of the Cayman Depositors.

188. In connection with the facts as set forth herein, FDIC-C intentionally engaged in certain acts for the purpose of denying SRE and insurance coverage to SVB Cayman and the Cayman Depositors, while permitting itself use of funds and credits associated with the SVB Cayman Operating Accounts, the accounts of the Cayman Depositors and the Subrogated Claims, in their conflicted position as the largest creditor in the SVB Receiverships.

189. FDIC-C would be unjustly enriched at the expense of Plaintiffs if they were permitted to receive and retain the full benefit of the funds and credits associated with the SVB Cayman Accounts and their Subrogated Claims.

190. SVB Cayman and the Cayman Depositors would suffer an unjust detriment if FDIC-C was permitted to receive and retain the full benefit of the funds and credits associated with the SVB Cayman Accounts and the Subrogated Claims.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

191.  Permitting FDIC-C to receive and retain the full benefit of funds and credits associated with the SVB Cayman Accounts and the Subrogated Claims at the expense of Plaintiffs, the SVB Cayman Estate and the Cayman Depositors would be against equity and good conscience.

192.  WHEREFORE, Plaintiffs on behalf of SVB Cayman and the Cayman Depositors seek restitution in the full amount of the SVB Cayman Accounts, plus any and all further amounts to be proven at trial.

**COUNT VII – VIOLATION OF DUE PROCESS UNDER THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION
(AGAINST GRUENBERG)**

193.  Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

194.  Pursuant to the Winding Up Order, subsequent orders of the Cayman Court and agency principles, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman Estate and as exclusive agent of the Cayman Depositors.

195.  The Fifth Amendment's Due Process Clause protects against the government's deprivation of property without adequate due process.  Further, the Fifth Amendment requires the federal government and government officials to govern impartially and not draw distinctions between individuals based on national origin.  Both SVB Cayman and the creditors-depositors of SVB Cayman are afforded these Constitutional rights.

196.  Gruenberg is a federal officer formerly employed by the Federal Deposit Insurance Corporation that, at all relevant times, acted under color of federal authority.

197.  In reaching the arbitrary decisions, which resulted in unconstitutional treatment on the basis of national origin, to classify the Cayman Depositors and SVB Cayman as holders of accounts not subject to protection under the SRE, Gruenberg deprived SVB Cayman and the Cayman Depositors of property without due process.

198.  Specifically, Gruenberg acted under the color of his authority to deny the Cayman Depositors and SVB Cayman with insurance and SRE coverage in a manner which resulted in national origin discrimination, depriving them of property associated with the accounts without due process.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

199. Gruenberg is subject to liability under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), because Plaintiffs' claim is not a "new context." The context of Plaintiffs' *Bivens* claim herein is the assertion that the Cayman Depositors were subjected to discrimination by Gruenberg in connection with the decisions not to provide SRE insurance to the SVB Cayman Accounts, resulting in national origin discrimination under the Equal Protection Clause. *Bivens* has previously been upheld to provide a remedy to aggrieved defendants under the Fifth Amendment on the basis of equal protection discrimination in *Davis v. Passman*, 442 U.S. 228, 248-49 (1979). In that case, the court held that plaintiff had a cause of action under the Fifth Amendment on the basis of sex discrimination where an employee was terminated solely because of her sex. Similarly, the Cayman Depositors allege that the conduct of the FDIC-C and Chairman resulted in discrimination based on equal protection – namely, their national origin. Such a distinction, the basis of the alleged discrimination, is not "meaningfully different." *Egbert v. Boule*, 596 U.S. 482, 483 (2022). Additionally, without a Fifth Amendment due process claim under *Bivens*, there is no meaningful avenue for relief from discrimination which may be occasioned by Gruenberg who it is believed personally engaged in such discriminatory practices due to his position as FDIC Chairman.

200. Even if this Court were to consider that this is a "new context" for application of a *Bivens* remedy, such extension would be appropriate. The circumstances of this case shock the conscience – where the FDIC itself is the largest creditor of the SVB Receiverships, Gruenberg – the FDIC Chairman – does not have the independence normally associated with a bank failure. Any amount that a creditor of the receivership recovers is a direct reduction in potential recovery for Gruenberg's former employer, the FDIC, resulting in a situation where Gruenberg was hopelessly conflicted at all material times. The inherent conflict of interest faced by Gruenberg, combined with the well-pled allegations the national origin discrimination which resulted from his decisions, and the potential effect on the public confidence in the banking industry, is particularly egregious and in need of a mechanism to enforce constitutional rights of account holders in the U.S. banking system.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

201. No statutory cause of action provides Plaintiffs with a meaningful remedy in connection with the constitutional violations of Gruenberg.

202. This Court can fashion an appropriate monetary remedy in connection with the constitutional violations of Gruenberg.

203. WHEREFORE, Plaintiffs seek compensatory damages against Gruenberg in connection with his violation of the Fifth Amendment of the United States Constitution, plus all fees, costs, interest and punitive damages.

**COUNT VIII: DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 *ET SEQ*.
(AGAINST FDIC-C)**

204. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

205. Pursuant to the Winding Up Order, subsequent orders of the Cayman Court and agency principles, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman Estate and as exclusive agent of the Cayman Depositors.

206. On March 12, 2023, the Secretary of the Treasury invoked the SRE to guarantee insurance coverage for all depositors of SVB. Thereafter, FDIC officials including Chairman Gruenberg, the Treasury Secretary, as well as numerous other senior government officials, made statements to the public and Congress confirming that the invocation of the SRE protected all deposits of all depositors of SVB including foreign depositors, with the intention of avoiding an international banking crisis by convincing SVB stakeholders, including depositors and others, that all deposits of all depositors were 100% covered and backstopped by FDIC-C through the DIF. None of the public statements of the Treasury Secretary or other federal officials indicated that foreign depositors – which historically had been a primary driver for invocation of the SRE – would not be fully protected. To the contrary, the March 16 Yellen Testimony confirms her intent for foreign depositors to receive SRE insurance.

207. Notwithstanding the clear terms of the Treasury Secretary's invocation of the SRE as publicly described multiple times, including by the FDIC, FDIC-C has refused to provide the SVB Cayman Estate and the Cayman Depositors with access to and/or has refused to pay to the SVB Cayman Estate and the Cayman Depositors any of their account funds from the DIF.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

208. Because FDIC-C continues to withhold access to or payment of funds due and owing to Plaintiffs, there is an actual controversy between the parties ripe for judicial resolution.

209. WHEREFORE, Plaintiffs respectfully request that this Court declare that: (i) FDIC-C has no right to, and is estopped from attempting to, ignore the Treasury Secretary's invocation and determination of the SRE, mandating FDIC-C to fully insure and pay all deposits of all depositors which includes deposits associated with the SVB Cayman Accounts; and (ii) FDIC-C must restore the SVB Cayman Accounts, including all interest earned since the date the SVB Cayman Accounts were blocked, transferred and/or dissipated.

**PRAYER FOR RELIEF**

NOW, THEREFORE, Plaintiffs pray for judgment and relief against Defendants as follows:

(1) Judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

(2) An order declaring that Plaintiffs are entitled to possession and SRE and insurance coverage of the SVB Cayman Accounts;

(3) An order enjoining FDIC-C and all affiliated entities acting in concert with FDIC-C from refusing to provide Plaintiffs with access to funds and credits associated with the SVB Cayman Accounts;

(4) An order directing FDIC-C to pay and turn over to Plaintiffs the full amount of funds associated with the SVB Cayman Accounts;

(5) An order declaring and holding unlawful and setting aside FDIC-C's denial of Plaintiffs' claims for insurance and SRE coverage under 12 U.S.C. § 1821(f) and/or 5 U.S.C. § 706 and requiring FDIC-C to pay to Plaintiffs the full amount of funds associated with the SVB Cayman Accounts;

(6) An order declaring Plaintiffs' claims to be valid and proven against the DIF;

(7) Compensatory and punitive damages as requested against Defendants herein;

(8) An award of pre- and post-judgment interest;

(9) An award of Plaintiffs' costs and attorneys' fees as may be permitted by law; and

(10) Such other and further relief as the Court may deem just and proper.

46

1 | Dated: April 3, 2025

2 | HOLLAND & KNIGHT LLP

3 | By: _____/s/ Warren E. Gluck_____
4 | Warren E. Gluck (*pro hac vice*)
   | Marie E. Larsen (*pro hac vice*)
   | HOLLAND & KNIGHT LLP
5 | warren.gluck@hklaw.com
   | marie.larsen@hklaw.com
6 | 787 Seventh Avenue, 31st Floor
   | New York, NY 10019
7 | 212-513-3396 (telephone)
   | 212-385-9010 (facsimile)
8 |
9 | Richard A. Bixter (*pro hac vice*)
   | HOLLAND & KNIGHT LLP
10 | richard.bixter@hklaw.com
   | 150 N. Riverside Plaza, Suite 2700
11 | Chicago, IL 60606
   | 312-422-9032 (telephone)
   | 312-578-6666 (facsimile)
12 |
13 | Daniel P. Kappes (SBN 303454)
   | HOLLAND & KNIGHT LLP
14 | daniel.kappes@hklaw.com
   | 560 Mission Street, Suite 1900
15 | San Francisco, CA 94105
   | 415-743-6951 (telephone)
   | 415-743-6910 (facsimile)
16 |
17 | *Attorneys for Plaintiffs*

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**TABLE OF EXHIBITS**

| Exhibit No. | Title |
|---|---|
| 1 | The President's Fiscal Year 2024 Budget with Treasury Secretary Janey L. Yellen, 118th Cong. 28 (2023) (testimony of Treasury Secretary Janey Yellen) |
| 2 | Sanction Orders of the Grand Court of the Cayman Islands, dated January 11, 2024, October 16, 2024, and November 21, 2024 |
| 3 | Transcript of the February 14, 2024 hearing in the matter of *In re Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation)*, No. 24-10076 (Bankr. S.D.N.Y.) |
| 4 | Winding-Up Order of the Grand Court of the Cayman Islands entered June 30, 2023 |
| 5 | Opinion of the Grand Court of the Cayman Islands entered on July 21, 2023 |
| 6 | *Some Foreign Silicon Valley Bank Depositors Were Shafted*, TAX NOTES FEDERAL, Vol. 183 (April 29, 2024) |
| 7 | *Report for the Special Review Committee of the Board of Directors of the Federal Deposit Insurance Corporation* (April 2024) |
| 8 | Companies Act (2023 Revision) Excerpts – Sections 88; 91(d)(iv); 100(2); 108(2); 145(1); 145(2) and (3); 146(1)(a); 146(2); 147 |
| 9 | Cayman Islands Banks and Trust Companies Act (2021 Revision) Excerpts |
| 10 | SVB Cayman Eurodollar Sweep Account Agreement |
| 11 | SVB Cayman Eurodollar Money Market Account Agreement |
| 12 | SVB Cayman Eurodollar Operating Agreement |
| 13 | Memorandum to the Board of Directors of the FDIC Regarding Wachovia (Sept. 29, 2008) |
| 14 | U.S. GOV'T ACCOUNTABILITY OFF., GAO-10-100, FEDERAL DEPOSIT INSURANCE ACT: REGULATORS' USE OF SYSTEMIC RISK EXCEPTION RAISES MORAL HAZARD CONCERNS AND OPPORTUNITIES EXIST TO CLARIFY THE PROVISION (April 2010) |
| 15 | Memorandum to the Board of Directors of the FDIC Regarding Citigroup (Nov. 23, 2008) |

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

| 16 | Joint Statement Press Release by the Department of the Treasury, Federal Reserve, and FDIC (March 12, 2023) |
| --- | --- |
| 17 | U.S. Gov't Accountability Off., GAO-23-10673, Bank Regulation: Preliminary Review of Agency Actions Related to March 2023 Bank Failures (April 2023) |
| 18 | March 13, 2023 Transfer Agreement |
| 19 | March 13, 2023 FDIC Press Release |
| 20 | FDIC Website SVB FAQ Printout |
| 21 | March 27, 2023 Purchase & Assumption Agreement between Silicon Valley Bridge Bank, N.A. and First-Citizens Bank & Trust Co. |
| 22 | June 13, 2023 Winding Up Petition |
| 23 | Transcript of December 5, 2013 FDIC-C Systemic Resolution Advisory Committee Meeting |
| 24 | Financial Statements for the SVB Receiverships for the Year Ending December 31, 2024 |
| 25 | Affirmation of Dr. Riz Mokal dated April 3, 2025 |
| 26 | Transcript of March 5, 2025 Deposition of Dr. Riz Mokal |
| 27 | April 17, 2024 SRE Claim Letter |
| 28 | September 25, 2024 FDIC-C SRE Claim Denial Letter |